UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ALBERT NORRESE JAMES ELDER,

               Petitioner,                                    Hon. Paul L. Maloney

v.                                              Case No. 1:05-CV-780

MARY BERGHUIS,

               Respondent.

_____/


## REPORT AND RECOMMENDATION

        This matter is before the Court on Elder's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Elder's petition be **granted**.


## BACKGROUND

        As a result of Petitioner's alleged involvement in drug activity, on or about February 3, 2002, Petitioner was charged with (1) possession with intent to deliver 50 grams or more, but less than 225 grams of cocaine; (2) possession with intent to deliver marijuana; and (3) possession of a firearm during the commission of a felony. (Dkt. #11, 15). Petitioner subsequently pleaded no contest to the two drug-related charges in return for the dismissal of the firearms charge. (Hearing Transcript, July 9, 2002, 3-15). Petitioner was at the time represented by Terry Nolan. (Tr. 3).

1

Petitioner's sentencing was scheduled for July 29, 2002. (Hearing Transcript, July 30, 2002, 4).

Nolan failed to appear for Petitioner's sentencing, however. (Tr. 4-5). The following day, the court learned that Nolan was allegedly suffering "severe depression" and feared he was experiencing a "nervous breakdown." (Tr. 5). The court noted that Nolan had engaged in this type of unprofessional and irresponsible conduct "dozens of times over the last five or six years." (Tr. 5-9). Nolan was, in fact, arrested the following day on cocaine possession charges. (Hearing Transcript, March 15, 2004, 99, 103).

Petitioner informed the court that when he told Nolan that he wanted to contest the charges at trial, that Nolan "broke down in tears and told [him] that his life was ruined." (Tr. 12). Petitioner indicated that he felt he had no choice but to accept the plea agreement because he lacked the resources to hire another attorney. (Tr. 12). Petitioner requested that he be appointed counsel and be permitted to withdraw his plea. (Tr. 11-12). The court dismissed Nolan from the matter and informed Petitioner that if he qualified financially, counsel would be appointed. (Tr. 12-13). With respect to Petitioner's request to withdraw his plea, the court informed Petitioner that he could discuss that matter with his new attorney. (Tr. 13).

Carl Krueger was appointed to represent Petitioner, who subsequently moved to withdraw his plea based on ineffective assistance of counsel by Nolan. (Hearing Transcript, September 23, 2002, 3-4). The prosecution stipulated to Petitioner's request. (Tr. 4). Petitioner was tried on the aforementioned charges beginning on January 14, 2003. (Dkt. #11). This trial ended in a mistrial when the jury was unable to reach a unanimous verdict. (Trial Transcript, January 17, 2003, 3-8). Petitioner's second trial began on March 18, 2003. Several individuals testified at this trial. The relevant portions of their testimony are summarized below.

**Detective Steven Stout**

Stout testified that as of February 4, 2002, he was employed as a Detective for the City of Muskegon Police Department.  (Trial Transcript, March 18, 2003, 238-39).  In the early morning hours of February 4, 2002, Detective Stout participated in a search of the residence at 1200 East Broadway in Muskegon County.  (Tr. 239).  This residence was owned by Tina Halasinski.  (Trial Transcript, March 18, 2003, 11).

In the bottom drawer of a dresser, located in the bedroom, Stout discovered an "extra large" multi-colored "Nike spring-type coat."  (Trial Transcript, March 18, 2003, 240-44).  As he handled the coat, Detective Stout "felt some - some items inside the coat."  (Tr. 244).  An examination of the coat pockets revealed two baggies, one containing a substance believed to be cocaine and another containing a substance believed to be marijuana.  (Tr. 244-45).  Further search of this particular dresser drawer revealed a cigar package containing a substance believed to be marijuana.  (Tr. 247).

These substances were subsequently delivered to the Michigan State Police Crime Lab, where analysis determined they were cocaine and marijuana.  (Trial Transcript, March 18, 244-54; Trial Transcript, March 19, 2003, 4-6).  The lab further determined that the cocaine weighed 62.40 grams and that the marijuana weighed 105.73 grams.  (Trial Transcript, March 19, 2003, 4).  Further search of the residence revealed no evidence of razor blades, pipes, straws, currency rolled up to resemble a straw, mirrors covered with drug residue, or other drug paraphernalia.  (Trial Transcript, March 19, 2003, 6-7).

**Detective Richard Bleich**

Bleich testified that as of February 4, 2002, he was employed as a Detective for the City of Muskegon Police Department. (Trial Transcript, March 19, 2003, 15). Detective Bleich accompanied Detective Stout in the search that morning of Tina Halasinski's residence. (Tr. 15). As the "primary investigator on the case," Bleich did not conduct the search, but instead acted as supervisor of the endeavor. (Tr. 15). Detective Bleich testified that another detective who was participating in the search, discovered an item of "mail that was delivered to Albert Elder at 1200 East Broadway Avenue in Muskegon, Michigan." (Tr. 17).

On cross-examination, Detective Bleich testified that he had no knowledge as to how the sender of this item of mail determined to address mail to Petitioner at that particular address. (Tr. 20-21). Bleich testified that he never examined Petitioner's driver's license or checked with the Secretary of State to determine Petitioner's address. (Tr. 24-25). Detective Bleich testified that he never observed Petitioner (or Petitioner's vehicle) at this residence. (Tr. 21-22, 25-26). Bleich acknowledged that he never spoke with any of Tina Halasinski's neighbors to determine whether Petitioner lived at Halasinski's residence. (Tr. 26). Detective Bleich acknowledged that aside from the aforementioned jacket, he recovered no other clothing allegedly belonging to Petitioner. (Tr. 22-23). Detective Bleich testified that he declined to have the crime lab test the baggies in which the suspected drugs were discovered tested for fingerprints. (Tr. 26-27). Bleich acknowledged that he had no idea when the drugs were placed in the jacket or who placed them there. (Tr. 27-28).

On redirect examination, Detective Bleich testified that the reason he did not perform the various investigatory tasks referenced by Petitioner on cross-examination was that he had been informed by members of the West Michigan Enforcement Team that Petitioner had confessed to

possessing the drugs in question.  (Tr. 30-34).


**Michelle Marfori**

Marfori testified that she was employed as a forensic scientist with the Michigan State Police.  (Trial Transcript, March 18, 2003, 210).  Specifically, Marfori indicated that she worked in the forensic biology section, also known as the DNA unit.  (Tr. 210).

Marfori performed DNA testing in this matter, comparing "a cutting" from the collar of the jacket recovered in the aforementioned search to "a known blood sample from Albert Elder." (Tr. 218-21, 243-44).  Marfori compared "the jacket [sample] to the known blood sample at 13 different regions of the DNA including a gender marker which just indicates if it's from a male or female."  (Tr. 223).  Marfori concluded that "at 8 out of the 13 regions, there were enough differences in intensity of DNA, that the major donor, the major DNA types at 8 regions matched the DNA types obtained from the known sample of Albert Elder."  (Tr. 223).

With respect to the five remaining regions, Marfori reported that "there is not enough differences in intensity of the DNA types to - to identify a major donor."  (Tr. 224).  She further testified, however, that "Albert Elder cannot be excluded as being a contributor to the DNA obtained at those locations."  (Tr. 224).  Marfori testified that the probability "of randomly choosing an individual from the population that would have the same DNA types as the major donor at those 8 locations in the Caucasian population is 1 in 2.7 billion; the African-American population is 1 in 5.7 billion; and in the Hispanic population is 1 in 11.7 billion."  (Tr. 225).

On cross-examination, Marfori acknowledged that she did not know how the DNA that she obtained from the jacket got on the jacket or how long the material had been on the jacket.

(Tr. 232). Marfori also acknowledged that she was not asked to compare the jacket with a DNA sample from any other individuals. (Tr. 231).

**Officer Steve Waltz**

Waltz testified that as of the date drugs were discovered at Tina Halasinski's residence, he was employed as a detective with the West Michigan Enforcement Team. (Trial Transcript, March 19, 2003, 38-39). Waltz became involved in the investigation of this matter following Petitioner's arrest. (Tr. 39). Officer Waltz subsequently questioned Petitioner.[1] (Tr. 39). Petitioner informed Officer Waltz that cocaine and marijuana was located in a dresser drawer at the 1200 East Broadway residence. (Tr. 41-43). Petitioner indicated that "there were approximately" two grams of cocaine in the dresser drawer. (Tr. 41). Petitioner acknowledged that the drugs belonged to him. (Tr. 46).

**Detective Sergeant Ramon Barthelemy**

Barthelemy testified that he was in charge of the City of Muskegon "Narc Unit" and was also assigned to the West Michigan Enforcement Team. (Trial Transcript, March 19, 2003, 48). Detective Sergeant Barthelemy was present when Officer Waltz interviewed Petitioner. (Tr. 49). Barthelemy testified that when questioned about the drugs recovered from Tina Halasinski's residence, Petitioner acknowledged that they belonged to him. (Tr. 49-50). According to

---

[1] No evidence was presented at trial concerning the date on which this interview occurred. At a post-trial evidentiary hearing, discussed below, Officer Waltz and various other individuals testified that this interview occurred on April 24, 2002. This is consistent with an April 17, 2002 letter that the prosecutor mailed to Terry Nolan concerning this interview. (Dkt. #28).

6

Barthelemy, Petitioner indicated that he thought he had 64 grams of cocaine. (Tr. 50).

In light of Barthelemy's testimony that he had worked as an uncover narcotics officer for ten years, the court recognized Barthelemy as "an expert in the field of drug trafficking in Muskegon County." (Tr. 51-52). Barthelemy reported that "drug dealers. . .don't like to get caught with [their drugs], so they will enlist other people to hide it for them in other houses, you know, cars, whatever." (Tr. 60). Barthelemy testified that "99.9 percent of the time" drug dealers hide their product in this fashion. (Tr. 60). He reported that drug dealers "usually" have a female acquaintance hide their drugs for them on the belief that the police will more readily believe them and "won't search them as thoroughly." (Tr. 60).

Barthelemy testified that if an individual is seeking to purchase drugs for re-sale, he will generally purchase larger amounts "because you always get a deal if you buy larger quantity." (Tr. 60-61). Purchasing drugs at a "cheaper" price resulted in the dealer receiving "much more" profit. (Tr. 62). Barthelemy indicated that purchases of cocaine in amounts greater than one ounce suggested that the individual was purchasing the drug for later re-sale. (Tr. 60-61). Barthelemy further indicated that purchases of marijuana greater than one-quarter pound suggested that the buyer intended to resell the drug. (Tr. 61).

Following a jury trial, Petitioner was convicted of (1) possession with intent to deliver 50 grams or more, but less than 225 grams of cocaine and (2) possession with intent to deliver marijuana.[2] (Tr. 121). As a second habitual offender, Petitioner received consecutive sentences of 12-30 years on the cocaine charge and 2-6 years on the marijuana charge. (Sentencing Transcript,

---

[2]  The charge of possession of a firearm during the commission of a felony was dismissed prior to Petitioner's second trial.

April 21, 2003, 10-11).  Petitioner appealed his conviction to the Michigan Court of Appeals

asserting the following claims:

> I.  The trial court reversibly erred in denying the defense motion to suppress the search warrant and the fruits of the resulting search of the Broadway Avenue house.
>
> II.  The Defendant was unlawfully denied the effective assistance of trial counsel at and before the police interview of the Defendant.
>
> III.  The trial court reversibly erred in overruling the Defendant's *Batson* challenge.
>
> IV.  The Defendant was unlawfully denied the effective assistance of trial counsel when trial counsel failed and/or refused to object to the lack of a proper foundation to admit the DNA evidence.
>
> V.  The trial court abused its discretion and reversibly erred in admitting as substantive evidence the drug profile evidence the prosecutor admitted through Detective Barthelemy.
>
> VI.  The evidence was insufficient for guilt on the possession with intent to deliver charges as to both the cocaine and marijuana.
>
> VII.  The trial court violated the U.S. and Michigan constitutions in sentencing the Defendant to a prison term of 12 years to 30 years on a habitual offender 2d supplement arising out of the possession with intent to deliver 50-224 grams of cocaine conviction and in sentencing him to a consecutive term on the habitual offender 2d supplement arising out of possession with intent to deliver marijuana conviction.

The Michigan Court of Appeals subsequently remanded the matter to the trial court

so that Petitioner could obtain an evidentiary hearing on his claim that he was denied the right to the

effective assistance of counsel.  *People v. Elder*, No. 248287, Order (Mich. Ct. App., Feb. 2, 2004).

Following a two-day hearing, the trial court determined that neither Terry Nolan nor Carl Krueger deprived Petitioner of the right to the effective assistance of counsel. *People v. Elder*, No. 02-47066-FH, Opinion (Muskegon Cnty. Cir. Ct., Mar. 18, 2004).  Petitioner thereafter filed in the Michigan Court of Appeals a supplemental brief asserting the following claim:

> I.  The Defendant was unlawfully denied the effective assistance of trial counsel in allowing the Defendant to confess and in failing to move to suppress the confession, as well as in failing to object to the lack of a proper foundation for the admission of the DNA evidence.

The Michigan Court of Appeals affirmed Petitioner's conviction.  *People v. Elder*, No. 248287, Opinion (Mich. Ct. App., Mar. 10, 2005).  Asserting the same claims, Petitioner then moved in the Michigan Supreme Court for leave to appeal.  The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Elder*, No. 128574, Order (Mich., Oct. 31, 2005).  On November 21, 2005, Elder submitted the present petition for writ of habeas corpus in which he asserts the following claims:

> I.  Petitioner was denied his constitutional right for failure of the trial court to suppress the search warrant as a product of the poisonous fruit doctrine.
>
> II.  Petitioner was denied his right to counsel and effective assistance of counsel where no one was present during a police interview.
>
> III.  Petitioner was denied his right to a fair and impartial jury.
>
> IV.  Petitioner was denied the effective assistance of counsel.
>
> V.  Petitioner was denied his constitutional right to a fair

9

trial where evidence of drug profile was admitted.

VI.     The evidence was insufficient to show that Petitioner
        intended to deliver cocaine or marijuana.

VII.    The Court violated the Constitution by sentencing
        Petitioner as an habitual offender without conducting
        a trial on the merits.

## STANDARD OF REVIEW

Elder's petition, filed November 21, 2005, is subject to the provisions of the

Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The

AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)     An application for a writ of habeas corpus on behalf of a
        person in custody pursuant to the judgment of a State court
        shall not be granted with respect to any claim that was
        adjudicated on the merits in State court proceedings unless
        the adjudication of the claim —

        (1)     resulted in a decision that was contrary to, or involved
                an unreasonable application of, clearly established
                Federal law, as determined by the Supreme Court of
                the United States, or

        (2)     resulted in a decision that was based on an
                unreasonable determination of the facts in light of the
                evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to

"prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the

extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law

10

when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S.

at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority.  The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law.  *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct.  *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)).  Petitioner can rebut this presumption only by clear and convincing evidence.  *Id.*

## ANALYSIS

I.        **Fourth Amendment Claim**  (Habeas Claim I)

Prior to trial, Petitioner moved in the trial court to quash the search warrant on which the search of the residence at 1200 East Broadway Avenue was premised, as well as the items recovered during the subsequent search.  After receiving evidence on the matter, the court denied Petitioner's motion, concluding that "the magistrate had probable cause to issue the search warrant." *People v. Elder*, No. 02-47066-FH, Opinion (Muskegon Cnty. Cir. Ct., Dec. 5, 2002).  Petitioner asserts that this determination was erroneous and violates his Fourth Amendment right to be free from unreasonable search and seizure.  Fourth Amendment claims such as this, however, are not cognizable in habeas corpus cases.  *See Stone v. Powell*, 428 U.S. 465, 481-82 (1976).

In *Stone*, the Court held that so long as the State provided the petitioner with an

opportunity for "full and fair" litigation of his Fourth Amendment claim, federal habeas corpus relief does not lie on the ground that evidence obtained in an allegedly unconstitutional search or seizure was introduced against him at trial. *Id.* at 482. In *Riley v. Gray*, 674 F.2d 522 (6th Cir 1982), the Sixth Circuit held that to determine whether a petitioner was afforded a "full and fair" opportunity to litigate his Fourth Amendment claim, the court must undertake a two-prong analysis. *Id.* at 526. The court must first determine whether the State has a procedural mechanism that, in the abstract provides an opportunity to present a Fourth Amendment claim. Assuming the State provides such a mechanism, the question then becomes whether the presentation of the claim was frustrated by a failure of that mechanism. *Id.*; *see also*, *Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000) (quoting *Riley*, 674 F.2d at 526).

Pursuant to Michigan court rules, criminal defendants can challenge the admissibility of evidence during a preliminary examination or in the trial court. M.C.R. 6.110(D). Michigan court rules further provide criminal defendants with the right to appeal should such a challenge prove unsuccessful. M.C.R. 7.203(A)(1). The mechanisms provided by the State of Michigan are, therefore, clearly adequate. *See Riley*, 674 F.2d at 526.

With respect to the second prong of the analysis, Petitioner has neither asserted nor demonstrated that the available procedural mechanisms failed or that his attempts to employ such were frustrated. Moreover, the Court discerns no evidence of any such failure or frustration. The trial court received evidence on the matter and issued a written opinion articulating its rationale for denying Petitioner's motion. The Michigan Court of Appeals examined Petitioner's claim and discussed in detail its rationale for upholding the trial court's ruling on the matter. The Court recommends, therefore, that Petitioner's Fourth Amendment claim is not cognizable in this

13

proceeding.

## II.        **Sentencing Claim**  (Habeas Claim VII)

Petitioner asserts that the duration of his sentence, as well as the process by which his sentence was carried out, violated his constitutional rights.  Before addressing the merits of Petitioner's claims, the Court must address Respondent's argument that Petitioner has failed to properly exhaust a particular aspect of this claim.

Elder initiated this action by completing and submitting the standard form mandated by this Court's Local Rules.  Petitioner also submitted with this form a variety of other material, including a copy of some of the briefing he submitted on direct appeal in the state courts.  On the standard form, Petitioner stated his seventh habeas claim as "the Court violated the Constitution by sentencing him as an habitual offender without conducting a trial on the merits."   In his accompanying brief, Petitioner asserts that his sentence: (1) violates recently enacted provisions of Michigan law, and (2) constitutes cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution, because it is disproportionate to his crime.  Respondent asserts that Petitioner has failed to exhaust his claim that the trial court violated his constitutional rights "by sentencing him as an habitual offender without conducting a trial on the merits."  The Court disagrees.

Federal law provides that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that. . .the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).   The purpose of the exhaustion requirement is to give the state courts the first

14

opportunity to "pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). To provide the State with the requisite opportunity, the petitioner must "fairly present" the substance of his claim "in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted).

The fair presentation requirement is not satisfied where the petitioner simply makes in the State court "a general appeal to a constitutional guarantee as broad as due process" or only identifies "the facts necessary to state a claim for relief." *Gray v. Netherland*, 518 U.S. 152, 163 (1996). The petitioner "must present his claim to the state courts as a federal constitutional issue - not merely as an issue arising under state law." *Collins v. Wells*, 1994 WL 64702 at *3 (6th Cir., Mar. 1, 1994) (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)). However, the petitioner is not required to "recite a specific sequence of words to fulfill the exhaustion requirement, nor is there some sort of threshold requirement whereby Petitioner must dedicate a certain number of words to analysis of federal law," as simply "[l]abeling a claim as a federal claim is sufficient." *Daniels v. Lafler*, 192 Fed. Appx. 408, 418 (6th Cir., Aug. 4, 2006) (citing *Baldwin*, 541 U.S. at 32).

In his initial brief in the Michigan Court of Appeals, dated December 11, 2003, Petitioner asserted that his sentence: (1) violates recently enacted provisions of Michigan law, and (2) constitutes cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution, because it is disproportionate to his crime. On June 24, 2004, the United States Supreme Court issued its decision in *Blakely v. Washington*, 542 U.S. 296 (2004). In *Blakely*, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a

crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 301 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)). On August 10, 2004, Petitioner submitted a supplemental brief to the Michigan Court of Appeals, in which he asserted that the enhanced sentence that was imposed upon him by the trial court violated the rule announced in *Blakely* because it was premised on facts neither admitted to by Petitioner nor found by the jury. The Michigan Court of Appeals specifically addressed and rejected Petitioner's *Blakely* claim.

When he subsequently moved in the Michigan Supreme Court for leave to appeal, Petitioner asserted in his Application for Leave to Appeal that the Michigan Court of Appeals "mistakenly" rejected his *Blakely* claim. Petitioner also submitted a brief in which he asserted that his sentence: (1) violates recently enacted provisions of Michigan law, and (2) constitutes cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution, because it is disproportionate to his crime.

As noted above, using the Court's standard habeas form Petitioner asserts in this Court that "the court violated the Constitution by sentencing him as an habitual offender without conducting a trial on the merits." Respondent asserts that Petitioner failed to assert this particular claim in the state courts. While Elder does not expressly refer to *Blakely* in his petition, this claim clearly implicates that decision. In his supplemental brief in the Michigan Court of Appeals, Petitioner asserted that the enhanced sentence he received violated *Blakely* because it was premised on facts neither admitted to by Petitioner nor found by the jury. A review of the sentencing transcript reveals that the "enhanced sentence" Petitioner received was premised on the trial court's determination that Petitioner was an habitual offender. (Sentencing Transcript, April 21, 2003, 5-

16

11).  Thus, the Court fails to discern a distinction between the *Blakely* claim that Petitioner asserted in the Michigan courts and the *Blakely* claim that he asserts in this Court.  Accordingly, the Court finds that Petitioner has exhausted his claim that "the court violated the Constitution by sentencing him as an habitual offender without conducting a trial on the merits."

As for Petitioner's habeas claims that his sentence violates Michigan law and constitutes cruel and unusual punishment, Petitioner has submitted in this Court a copy of the brief he submitted on these issues in the Michigan Court of Appeals and the Michigan Supreme Court. Thus, with respect to these two claims, Petitioner is advancing in this Court the same arguments that he presented to the state courts.  The Court, therefore, finds that these claims are likewise exhausted. In sum, for the reasons articulated herein, the Court finds that Petitioner has properly exhausted the sentencing claims asserted in Claim VII of his petition for writ of habeas corpus.  While these claims are properly exhausted, the Court concludes that they are without merit.

A.     *Blakely* Claim

As noted above, the *Blakely* Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Blakely*, 542 U.S. at 301 (quoting *Apprendi*, 530 U.S. at 490).  Petitioner asserts that his sentence violates this rule because the trial court, in fashioning his sentence, relied upon facts which were neither admitted nor proven beyond a reasonable doubt.

In *Blakely*, the defendant pleaded guilty to second degree kidnaping involving domestic violence and use of a firearm.  *Blakely*, 542 U.S. at 298-99.  In so doing, Blakely admitted

17

"the elements of second-degree kidnaping and the domestic-violence and firearm allegations, but no other relevant facts." *Id.* at 299.  Washington law provided that the "standard range" to which a defendant, convicted of this particular offense, could be sentenced was 49-53 months.  However, the sentencing court was permitted to impose a sentence in excess of the "standard range" if it found "substantial and compelling reasons justifying an exceptional sentence."  Before imposing an "exceptional sentence," the sentencing court was required to "set forth findings of fact and conclusions of law supporting it." *Id.*

The State recommended that Blakely receive a "standard range" sentence of 49-53 months. *Id.* at 300.  The sentencing court rejected this recommendation, however, and, finding that Blakely acted with "deliberate cruelty," imposed an "exceptional" sentence of 90 months. *Id.* at 300-01.  As the *Blakely* Court recognized, under Washington law, the court "could not have imposed the exceptional 90-month sentence solely on the basis of the facts admitted in the guilty plea," but instead could do so only based on the court's additional determination that Blakely acted with "deliberate cruelty." *Id.* at 304.  The Court held, therefore, that this sentence violated Blakely's Sixth Amendment right to trial by jury because it was predicated on facts that were neither admitted by Blakely nor found by a jury. *Id.* at 301-05.

The *Blakely* Court, however, made clear that its holding applied only to "determinate-sentencing schemes" such as that employed by the State of Washington. *Id.* at 308-09.  The Court recognized that *indeterminate* sentencing schemes do not run afoul of the Constitution because while such schemes may sanction "judicial discretion" in sentencing, they do not accomplish such "at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty." *Id.* at 308-09.  As the Court recognized:

18

> Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence - and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned. In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail. In a system that punishes burglary with a 10-year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is *entitled* to no more than a 10-year sentence - and by reason of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury.

*Id.* at 309.

A review of the sentencing transcript in this matter reveals that the only fact-finding in which the trial court engaged was to find that because Petitioner had previously been convicted of armed robbery and possessing a firearm during the commission of a felony he was "guilty of the offense of being a habitual felon." (Sentencing Transcript, April 21, 2003, 5-6). The Constitution does not, however, preclude a trial court from engaging in fact-finding regarding a criminal defendant's prior convictions. *See United States v. Mooneyham*, 473 F.3d 280, 295 (6th Cir. 2007) ("From *Apprendi* to *Blakely* to *Booker*, the Court has continued to except such factfinding [of prior criminal convictions] from the requirements of the Sixth Amendment"); *United States v. Snipes*, 236 Fed. Appx. 996, 1000-01 (6th Cir., June 29, 2007) ("the facts of Snipes's prior convictions are specifically exempted from *Blakely's* general rule that facts increasing a defendant's maximum penalty must be admitted by a defendant or found by a jury"). However, even if the trial court is determined to have engaged in fact-finding beyond simply determining that Petitioner had previously been convicted of a felony, the result is the same.

As is well recognized, the State of Michigan employs an indeterminate sentencing

19

scheme. *See, e.g., Butz v. Berghuis*, 2009 WL 33462 at *3 (W.D. Mich., Jan. 5, 2009) (Maloney, C.J.); *Jenkins v. Harry*, 2009 WL 103991 at *2 (W.D. Mich., Jan. 14, 2009).  Petitioner was convicted of (1) possession with intent to deliver 50 grams or more, but less than 225 grams of cocaine and (2) possession with intent to deliver marijuana.  Pursuant to Michigan law, the cocaine conviction subjected Petitioner to a sentence of 10-20 years, whereas the marijuana conviction subjected Petitioner to a prison term of not more than four years.  (Dkt. #11; Mich. Comp. Laws §§ 333.7401(2)(a)(iii), 333.7401(2)(d)(iii)).

Michigan law also provided that the "term of imprisonment" for the cocaine conviction "shall be imposed to run consecutively with any term of imprisonment imposed for the commission of another felony." Mich. Comp. Laws § 333.7401(3).  Furthermore, because Petitioner was also convicted of being an habitual offender, the sentencing court was permitted under Michigan law to sentence Petitioner to "a maximum term [of imprisonment] that is not more than 1-1/2 times" the maximum sentence otherwise permitted.  Mich. Comp. Laws § 769.10(1)(a).

As previously noted, Petitioner was sentenced to the following consecutive terms of imprisonment: (a) 12-30 years on the cocaine charge and (b) 2-6 years on the marijuana charge.  The maximum terms of these sentences each represent "1-1/2 times" the maximum sentence otherwise allowed.  Thus, when Petitioner committed these particular crimes he knew that he could possibly receive sentences of this magnitude.  Because Petitioner received a sentence within the range permitted by Michigan law as a result of his convictions (as determined by the jury) and his status as a prior felon (as found by the trial court), any additional fact-finding in which the trial court may have engaged does not violated Petitioner's rights under *Blakely* or the Sixth Amendment.

The Michigan Court of Appeals rejected Petitioner's *Blakely* claim.  *People v. Elder*,

20

No. 248287, Opinion at 4 (Mich. Ct. App., March 10, 2005).  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.      Proportionality and State Law Claims

In the brief submitted with his petition, Elder asserts that his sentence: (1) violates recently enacted provisions of Michigan law, and (2) constitutes cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution, because it is disproportionate to his crime.  To the extent that Petitioner alleges that he is being confined in violation of state law, his claim is not cognizable.  *See* 28 U.S.C. § 2254(a) (the federal courts can only consider habeas claims alleging "violation of the Constitution, laws, or treaties of the United States").

Petitioner's claim that his sentence is disproportionate to his crime, likewise fails.  As the Sixth Circuit has observed, because the United States Constitution "contains no strict proportionality guarantee," a claim that the sentencing court violated Michigan's principles of proportionality is not cognizable on federal habeas review.  *Lunsford v. Hofbauer*, 1995 WL 236677 at *2 (6th Cir., April 21, 1995) (citing *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991)); *Butz*, 2009 WL 33462 at *4 (citing *Lunsford*, 1995 WL 236677 at *2).

Moreover, the Eighth Amendment to the United States Constitution "does not require strict proportionality between crime and sentence."  *United States v. Layne*, 324 F.3d 464, 473 (6th Cir. 2003) (quoting *Harmelin*, 501 U.S. at 1001).  Instead, the Eighth Amendment simply forbids

21

extreme sentences that are "grossly disproportionate" to the crime committed. *Layne*, 324 F.3d at 473. In this case, Petitioner's sentence is in absolutely no way "grossly disproportionate" to the crime committed. The state courts do not appear to have addressed Petitioner's proportionality claim, in which case the Court exercises *de novo* review of such. *See McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 123 S. Ct. 2527, 2542 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts). Even evaluated pursuant to this more generous standard, this claim is without merit.

In sum, for the reasons articulated above, the Court recommends that Petitioner has properly exhausted his sentencing claims, but that such claims do not merit habeas relief.

**III.        Evidentiary Claim**  (Habeas Claim V)

As discussed above, Detective Sergeant Barthelemy was recognized as an expert in "drug trafficking in Muskegon County." In that capacity, he testified that if an individual is seeking to purchase drugs for re-sale, he will generally purchase larger amounts "because you always get a deal if you buy larger quantity." He testified that purchasing drugs at a "cheaper" price resulted in the dealer receiving "much more" profit. Barthelemy indicated that purchases of cocaine in amounts greater than one ounce suggested that the individual was purchasing the drug for later re-sale. Barthelemy further indicated that purchases of marijuana greater than one-quarter pound suggested that the buyer intended to resell the drug. Petitioner asserts that the admission of this "drug-profile evidence" violated his "constitutional right to a fair trial" because it was used to establish that he

22

possessed cocaine and marijuana with the intent to distribute.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States. *Id.*

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). However, if "an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Id.* Fundamental fairness does not, however, "require a perfect trial," *Clemmons v. Sowders*, 34 F.3d 352, 358 (6th Cir. 1994), and courts have defined those violations that violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512. State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citations omitted).

Courts recognize that the intent to distribute drugs can properly be inferred from the possession of drugs in a quantity "too large for personal use alone." *United States v. Jackson*, 55 F.3d 1219, 1226 (6th Cir. 1995). The Michigan Court of Appeals rejected Petitioner's claim, stating:

> This Court has held that an officer can be qualified as an expert, based on his experience and training, and can testify as to the significance of a quantity of drugs as related to an intent to distribute. Thus, defendant cannot establish any error in the admission of Barthelemy's testimony.

*People v. Elder*, No. 248287, Opinion at 3 (Mich. Ct. App., March 10, 2005) (internal citations omitted).

23

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**IV.** **Sufficiency of the Evidence Claim** (Habeas Claim VI)

Petitioner asserts that he is entitled to habeas relief because his convictions are not supported by sufficient evidence. Specifically, Petitioner claims that there does not exist sufficient evidence that he "intended to deliver cocaine or marijuana." Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

24

Pursuant to Michigan law then in effect, an individual was guilty of possession with intent to deliver 50 grams or more, but less than 225 grams of cocaine if the following elements were satisfied: (1) the recovered substance is cocaine; (2) the cocaine is in a mixture weighing more than 50 grams, but less than 225 grams; (3) the defendant was not authorized to possess the substance; and (4) the defendant knowingly possessed the cocaine with the intent to deliver. *People v. Wolfe*, 489 N.W.2d 748, 752 (Mich. 1992). An individual was guilty of the crime of possession with intent to deliver marijuana if the following elements were satisfied: (1) the recovered substance is marijuana; (2) the marijuana weighed less than five kilograms; (3) the defendant was not authorized to possess the substance; and (4) the defendant knowingly possessed the marijuana with the intent to deliver. *See People v. Moncure*, 2004 WL 2413371 at *1 (Mich. Ct. App., Oct. 28, 2004) (citing *Wolfe*, 489 N.W.2d at 752). Petitioner challenges the sufficiency of the evidence only as to the last element. Petitioner asserts that the evidence did not support a finding that he knowingly possessed the drugs with the intent to deliver.

Under Michigan law, a person "need not have actual physical possession of a controlled substance to be guilty of possessing it," as possession "may be either actual or constructive." *Wolfe*, 489 N.W.2d at 753. Possession may be found "even when the defendant is not the owner of the recovered narcotics" and "possession may be joint, with more than one person actually or constructively possessing a controlled substance." *Id.* Actual delivery of narcotics is not required to prove intent to deliver. *Id.* at 755. Intent to deliver may be "inferred from the quantity of narcotics in a defendant's possession, from the way in which those narcotics are packaged, and from other circumstances surrounding the arrest." *Id.* Finally, possession with the intent to distribute "can be established by circumstantial evidence and reasonable inferences arising from that

25

evidence, just as it can be established by direct evidence." *Id.* at 756.

When viewed in a light most favorable to the prosecution, the evidence (as detailed above) is more than sufficient to support Petitioner's convictions. Officer Waltz and Detective Sergeant Barthelemy testified that Petitioner acknowledged ownership of the drugs recovered from Tina Halasinski's residence. Barthelemy testified that the amount of drugs in question indicated that Petitioner possessed the drugs with the intent to distribute. Furthermore, as noted above, the search of Tina Halasinski's residence revealed no evidence of drug paraphernalia or drug use, which supports the inference that the drugs were purchased with the intent to distribute.

The Michigan Court of Appeals rejected Petitioner's claim. *People v. Elder*, No. 248287, Opinion at 3-4 (Mich. Ct. App., March 10, 2005). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## V.        **Ineffective Assistance of Counsel Claims**  (Habeas Claims II and IV)

As previously noted, following his arrest resulting from the discovery of drugs at Tina Halasinski's residence, Petitioner was questioned by Officer Waltz and Detective Sergeant Barthelemy, both of whom were then assigned to the West Michigan Enforcement Team. At the time of this interview, Petitioner was represented by Terry Nolan. While Petitioner met with Nolan immediately prior thereto, Nolan did not attend or participate in this interview. Petitioner asserts that counsel's failure to attend this interview constituted ineffective assistance of counsel. Petitioner also

asserts that Carl Krueger rendered ineffective assistance when he neglected to object that the prosecutor failed to establish a sufficient foundation for the introduction of the DNA evidence discussed above.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, it must be demonstrated that counsel's actions were unreasonable under prevailing professional norms. *Id.* at 688. In making this determination, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Petitioner must further establish that his attorney's performance was prejudicial in that it denied him a fair trial. *Id.* at 687. This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc*), *cert. denied*, 113 S. Ct. 2969 (1993) (emphasis in original).

A.     Terry Nolan

As indicated above, before resolving Petitioner's appeal, the Michigan Court of Appeals remanded the matter to the trial court for an evidentiary hearing on Petitioner's claim that he was denied the right to the effective assistance of counsel.

At the evidentiary hearing, Terry Nolan and Joseph Bader, Muskegon County Senior

Assistant Prosecutor, testified regarding the circumstances of the April 24, 2002 interview of Petitioner by Officer Waltz and Detective Sergeant Barthelemy.  Nolan and Bader both testified that the prosecution was not interested in negotiating a plea agreement with Petitioner because the prosecutor believed that Petitioner was a "major drug dealer" and a "pretty dangerous guy" and because they "felt they had an open and shut case against him."  (Hearing Transcript, March 15, 2004, 72-73, 78, 83-85, 100; Hearing Transcript, March 16, 2004, 57, 60, 94).  Petitioner nonetheless "begged" Nolan "to try to help him."  (Hearing Transcript, March 15, 2004, 101).

Nolan approached the prosecutor and attempted to "do something" for Petitioner.  (Hearing Transcript, March 15, 2004, 73; Hearing Transcript, March 16, 2004, 57-61).  Nolan represented to Bader that Petitioner could provide information about "the intimate workings of a large cocaine operation into Muskegon County" controlled by another individual.  (Hearing Transcript, March 15, 2004, 100-01; Hearing Transcript, March 16, 2004, 57-58).  Bader agreed to allow the West Michigan Enforcement Team (WEMET) to interview Petitioner concerning "narcotics-related activities in Muskegon County."  (Hearing Transcript, March 15, 2004, 66; Hearing Transcript, March 16, 2004, 60-61).

Bader insisted that if Petitioner agreed to be interviewed by WEMET that any statements he made could be used against him at trial for the possession with the intent to distribute cocaine and marijuana charges, but could not be used to charge any new or additional weapons or drug offenses.  (Hearing Transcript, March 15, 2004, 65-68; Hearing Transcript, March 16, 2004, 61).[3]  Bader, however, refused to offer Petitioner anything specific in return until he could determine

---

[3]  This is consistent with an April 17, 2002 letter that the prosecutor mailed to Terry Nolan concerning this interview.  (Dkt. #28).

whether Plaintiff's statements were, in fact, truthful and proved of value in prosecuting other offenders. (Hearing Transcript, March 15, 2004, 77-85, 94, 100-02; Hearing Transcript, March 16, 2004, 61-63).

Bader testified that he had to conduct negotiations in this manner because, "[i]f we gave consideration and - - and got nothing in return, that also would become well known and we would either have people falsely accusing others of crimes or telling us misinformation just to get consideration." (Hearing Transcript, March 16, 2004, 69). Bader testified that while it may have appeared that negotiating in this manner provided the prosecutor with "something for nothing," that in reality if the prosecutor failed to reciprocate (i.e., give "consideration") when he received useful information that defendants would no longer be willing to cooperate. (Hearing Transcript, March 16, 2004, 63-65). Thus, it was in the prosecutor's best interest to reciprocate when a defendant provided useful information. (Hearing Transcript, March 16, 2004, 63-65). Nolan testified that negotiating in this manner was standard practice and that in his many years of dealing with the prosecutor's office whenever his clients provided something of value the prosecutor reciprocated with appropriate consideration. (Hearing Transcript, March 15, 2004, 94-95). Bader confirmed that Nolan's clients always received consideration when they provided valuable or useful information. (Hearing Transcript, March 16, 2004, 65).

Nolan testified that Petitioner was willing to be interviewed by Officer Waltz and Detective Sergeant Barthelemy because he wanted to try and avoid the 10-year minimum sentence he faced on the possession of cocaine with the intent to distribute charge. (Hearing Transcript, March 15, 2004, 85, 92-93). Nolan testified that prior to the interview he explained to Petitioner the rights he would be surrendering if he agreed to participate in the interview on the terms requested

by the prosecutor.  (Hearing Transcript, March 15, 2004, 70-71, 92-93).  Nolan also informed Petitioner of the risks that he faced by agreeing to the interview, namely that he would likely be asked to confess to the alleged conduct giving rise to the cocaine and marijuana charges, thus all but guaranteeing his conviction for those crimes.  (Hearing Transcript, March 15, 2004, 70-71, 92-93).  Nolan testified that Petitioner understood these matters and agreed to participate in the interview because both Nolan and Petitioner agreed that the likelihood that Petitioner would be acquitted on the cocaine and marijuana charges was "very small."  (Hearing Transcript, March 15, 2004, 70-71, 77-78, 92-93).

        The information Petitioner provided to Waltz and Barthelemy was of no value, however, as it led to no charges of other offenders.  (Hearing Transcript, March 15, 2004, 98; Hearing Transcript, March 16, 2004, 66-67).  Thus, Petitioner did not receive any consideration in return for the information he provided to Waltz and Barthelemy.  (Hearing Transcript, March 15, 2004, 82, 98; Hearing Transcript, March 16, 2004, 66-67).  Nolan and Bader both testified that in return for pleading no-contest to the cocaine and marijuana charges, the prosecutor nevertheless dismissed the remaining charge in this case, as well as several felony charges that Petitioner faced in a separate case.  (Hearing Transcript, March 15, 2004, 82-83, 98-99; Hearing Transcript, March 16, 2004, 84).  Nolan indicated, however, that he did not believe that this bargain was consideration for any information Petitioner provided to Waltz and Barthelemy.  (Hearing Transcript, March 15, 2004, 82, 98).

        With respect to his decision not to be present during Petitioner's interview with Waltz and Barthelemy, Nolan testified that he feared that his presence would "endanger" Petitioner's ability to secure a plea agreement in the event that Petitioner implicated some of Nolan's other criminal

30

defendant clients.  (Hearing Transcript, March 15, 2004, 82, 102).  Nolan also testified that, "I don't want to know about crimes that are being investigated or crimes that are going on and then someone gets tipped and I'm accused of doing it."  (Hearing Transcript, March 15, 2004, 82, 103).  Nolan testified that he did not recall ever participating in or being present for "a debriefing with the WEMET authorities."  (Hearing Transcript, March 15, 2004, 82, 69).

Bader testified that having conducted "a lot" of similar negotiations with Nolan's clients it was his "custom and practice" that if Nolan wanted to attend the interview that Nolan would have informed him of such.  (Hearing Transcript, March 16, 2004, 77-79).  Bader testified that he did not want Nolan to attend Petitioner's interview with Waltz and Barthelemy because it could have provided Nolan with information about police investigations or targets.  (Hearing Transcript, March 16, 2004, 77-78).

Petitioner did not testify at this evidentiary hearing and has neither submitted nor identified any evidence calling into question or dispute any of the testimony presented at the evidentiary hearing.

Considering that Petitioner received no benefit as a result of confessing to Officer Waltz and Detective Sergeant Barthelemy, it might appear that Nolan's strategy of allowing Petitioner to be interviewed by Officer Waltz and Detective Sergeant Barthelemy was misguided. Such sentiment is perhaps strengthened by the fact that it required two trials for the prosecutor to secure Petitioner's conviction.  However, assessing Nolan's conduct with the benefit of hindsight is inappropriate.  As the Supreme Court has held

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy

for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689-90 (internal citations omitted).

As indicated above, Nolan and Bader both believed at the time that Petitioner enjoyed little chance of prevailing at trial. While much of the evidence against Petitioner was circumstantial, it was not insubstantial. During the search of Tina Halasinski's residence, the police recovered the drugs in question, the jacket in which much of the drugs were located, and an item of mail addressed to Petitioner at Halasinski's residence. Also, the police had obtained the results of the DNA testing performed on the recovered jacket prior to the decision to allow Petitioner to interview with Officer Waltz and Detective Sergeant Barthelemy. (Hearing Transcript, March 16, 2004, 86, 94). The police had also recovered a weapon during the search of Ms. Halasinski's residence. (Tr. 86).

The prosecutor also expected Halasinski to testify against Petitioner at trial. (Tr. 94). At the first trial, Halasinski testified that Petitioner moved into her house on February 2, 2002. (Trial Transcript, January 15, 2003, 6-9). Halasinski testified that the jacket which police subsequently recovered in the search belonged to Petitioner. (Tr. 9-10). Halasinski testified that she did not place the drugs in the jacket. (Tr. 10). With respect to the handgun recovered during the search,

Halasinski testified that prior to the search Petitioner had informed that the weapon was located in her bedroom.  (Tr. 11-14).

Considering this evidence, it was not unreasonable for Nolan to conclude that Petitioner's chances of succeeding at trial were "very small."  In light of this evidence, as well as Petitioner's strong desire to avoid the 10-year minimum sentence he faced on the cocaine charge, it was not unreasonable for Nolan to agree to allow Petitioner to be interviewed by Waltz and Barthelemy pursuant to the conditions described above.  It was not unreasonable for Nolan to conclude that the potential benefit to Petitioner by cooperating outweighed the risks.

With respect to Nolan's decision to not attend Petitioner's interview with Waltz and Barthelemy, Petitioner has submitted no evidence (or advanced arguments) that contradicts Nolan's testimony that Petitioner knowingly agreed to speak with Waltz and Barthelemy in Nolan's absence. While the Court can certainly envision circumstances in which Nolan's failure to accompany Petitioner to the interview would constitute ineffective assistance, based on the evidence presented, Nolan's conduct, while perhaps presenting a close question, does not appear unreasonable.  That Petitioner's attempt at cooperation failed to secure him a plea bargain or sentence reduction is of no consequence, as the relevant question is the reasonableness of Nolan's action in light of the facts and circumstances *he faced at the time*.

The Michigan Court of Appeals rejected this particular claim, finding that Petitioner "has not overcome the strong presumption that Nolan's conduct constitutes sound trial strategy." *People v. Elder*, No. 248287, Opinion at 4-6 (Mich. Ct. App., March 10, 2005).  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not

33

based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.


      B.     Carl Krueger

      Petitioner asserts that his trial counsel rendered ineffective assistance because he: (1) did not move to suppress evidence of the statement Petitioner made to Officer Waltz and Detective Sergeant Barthelemy; and (2) failed to object to the lack of a proper foundation to admit the DNA evidence.


      1.     Petitioner's Statement

      Even if the Court assumes that counsel was ineffective for failing to move to suppress Petitioner's statement, Petitioner is not entitled to relief because he cannot establish that he suffered prejudice resulting from counsel's actions.  Petitioner asserts that if his statement had not been introduced into evidence he would not have been convicted.  The Court does not necessarily agree.  However, the Court need not address that issue because Petitioner has failed to establish that a motion to suppress would have been successful.  While Petitioner assumes that his statement was not admissible he has failed to establish that such is the case.

      The Michigan Court of Appeals rejected this claim, finding that Petitioner "knowingly and understandingly waived his right to self-incrimination and voluntarily provided his statement to the police."  *People v. Elder*, No. 248287, Opinion at 4-6 (Mich. Ct. App., March 10, 2005).  Considering the relevant legal standard and the evidence of record, the Court finds that this decision is neither contrary to, nor involves an unreasonable application of, clearly established

34

federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

### 2.    DNA Foundation

Petitioner challenges the admission of the DNA evidence on two grounds.  Petitioner argues that Michelle Marfori presented no testimony that the equipment on which the relevant DNA tests were performed was properly calibrated.  Petitioner also argues that the DNA evidence failed to satisfy the *Davis-Frye* test, applicable to the admissibility of scientific evidence.  Again, even if the Court assumes that Krueger was ineffective for failing to challenge the foundation for the admission of the DNA evidence, Petitioner is not entitled to relief because he cannot establish that he suffered prejudice resulting from counsel's actions.

At the evidentiary hearing on Petitioner's ineffective assistance of counsel claim, Petitioner's counsel represented to the trial court that he had spoken with Marfori and that if called to testify "she could prove that the equipment was calibrated, had been tested, and it tested and was functioning properly."  (Hearing Transcript, March 16, 2004, 4).  Petitioner has introduced no evidence suggesting otherwise.

With respect to whether the DNA evidence satisfied the *Davis-Frye* standard, Petitioner has identified numerous questions that he asserts are relevant when assessing the admissibility of DNA evidence.  However, Petitioner has not presented or identified evidence demonstrating that such questions and, therefore, the question of the admissibility of the DNA evidence, would have been resolved in his favor.  Unfounded speculation cannot form the basis for

habeas relief.

The Michigan Court of Appeals rejected this claim, finding that "any such objection [to the admissibility of the DNA evidence] also would have been meritless, or at best, would have been easily overcome by additional foundational testimony from the forensic scientist, which testimony the scientist was fully prepared to offer." *People v. Elder*, No. 248287, Opinion at 4-6 (Mich. Ct. App., March 10, 2005). In light of the relevant legal standard and the evidence of record, the Court finds that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**VI.        *Batson* Claim** (Habeas Claim III)

As detailed below, at the outset of Petitioner's second trial, the prosecutor used his peremptory challenges to eliminate from the jury panel three African-American jurors, as well as an Hispanic juror. Petitioner, an African-American, asserts that the prosecutor unlawfully exercised his peremptory challenges in a racially discriminatory manner, thereby violating his constitutional right to the equal protection of the laws. The Court agrees.

The Civil Rights Act of 1875 included a provision which made it a criminal offense to exclude persons from jury service "on account of race, color, or previous condition of servitude." 18 U.S.C. § 243. As the Supreme Court has recognized, the "[e]xclusion of black citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure." *Batson v. Kentucky*, 476 U.S. 85 (1986). The Supreme Court also long ago recognized that

excluding black jurors on the basis of their race implicates a criminal defendant's constitutional rights. *See Strauder v. West Virginia*, 100 U.S. 303, 310 (1879) (holding that an African-American criminal defendant's right to the equal protection of the laws is violated when he is tried before a jury from which African-Americans have been purposefully excluded "because of their color").

The *Batson* Court reaffirmed the principle that a "State's purposeful or deliberate denial to [African-Americans] on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause." *Id.* at 84 (quoting *Swain v. Alabama*, 380 U.S. 202, 203-04 (1965)). As the Court observed:

> Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try. Competence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at trial. A person's race simply 'is unrelated to his fitness as a juror.' As long ago as *Strauder*, therefore, the Court recognized that by denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror. The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice. Discrimination within the judicial system is most pernicious because it is 'a stimulant to that race prejudice which is an impediment to securing to [black citizens] that equal justice which the law aims to secure to all others.'

*Batson*, 476 U.S. 87-88 (internal citations omitted).

Accordingly, the *Batson* Court held that "the State's privilege to strike individual jurors through peremptory challenges is subject to the commands of the Equal Protection Clause" which "forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against

a black defendant." *Id.* at 89 (citations omitted).

In *Batson*, the defendant and the jurors whose elimination he challenged were all African-American, *id.* at 82-83, thus the Court was not presented with the question of whether the Constitution was implicated in a circumstance where a criminal defendant was of a different race from the juror(s) whose elimination was allegedly based on racial grounds.  The Court has since addressed this question, holding that "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same races." *Powers v. Ohio*, 499 U.S. 400, 402 (1991).

When a criminal defendant alleges that a prosecutor has exercised a peremptory challenge in a racially discriminatory manner, the trial court must employ the now familiar three-step burden shifting analysis.  First, the defendant must make a prima facie showing that a peremptory challenge was exercised on the basis of race.  *See Rice v. Collins*, 546 U.S. 333, 338 (2006) (citing *Batson*, 476 U.S. at 96-97).  When assessing whether the defendant has satisfied this requirement, the trial court "should consider all relevant circumstances." *Batson*, 476 U.S. at 96.  As the *Batson* Court recognized, "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Id.* at 97.  Likewise, "the prosecutor's questions and statements during *voir dire* examination and in exercising the challenges may support or refute an inference of discriminatory purpose." *Id.*  The defendant's burden at step one is not "onerous" and is satisfied "by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005).

If the defendant makes a prima facie showing that a peremptory challenge was exercised on the basis of race, the burden shifts to the prosecutor who must articulate a race-neutral

38

rationale for the excusing the juror in question.  *See Rice*, 546 U.S. at 338 (citing *Batson*, 476 U.S. at 96-97).  The prosecutor's burden at this step is minimal.  The prosecutor is not obligated to advance a reason "that is persuasive, or even plausible."  *Rice*, 546 U.S. at 338 (quoting *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995)).  The prosecutor need only articulate a reason that is "comprehensible" and "not inherently discriminatory."  *Rice*, 546 U.S. at 338 (quoting *Purkett*, 514 U.S. at 767-68).  Nevertheless, the prosecutor cannot satisfy his burden by simply "denying that he had a discriminatory motive" or asserting his "good faith in making individual selections."  *Batson*, 476 U.S. at 98 (citation omitted).  The prosecutor must articulate "a neutral explanation *related to the particular case to be tried*."  *Id.* (emphasis added).

If the prosecutor offers a sufficiently neutral rationale for excusing the juror in question, the burden shifts back to the criminal defendant who must establish that, despite the prosecutor's allegedly race-neutral rationale for excusing the juror in question, the prosecutor purposely excused the juror for discriminatory reasons.  *Rice*, 546 U.S. at 338 (citations omitted). At this step of the analysis, the court must evaluate "the persuasiveness of the justification" offered by the prosecutor.  However, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."  *Id.* (citation omitted).  When making this determination, "all of the circumstances that bear upon the issue of racial animosity must be consulted."  *Snyder v. Louisiana*, 128 S.Ct. 1203, 1208 (2008).

As previously discussed, a petitioner imprisoned pursuant to a judgment by a state court is entitled to habeas relief if the relevant state court decision either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. § 2254(d).  As the Supreme Court has recognized, where the state courts apply the three-step burden-shifting framework identified above, a *Batson* claim can succeed only if the petitioner can establish that the relevant state court decision was based on "an unreasonable determination of the facts in light of the evidence presented."  *See Rice*, 546 U.S. at 341-42.  As previously observed, when assessing whether a state court decision was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct and Petitioner can rebut this presumption only by clear and convincing evidence.  *See Warren*, 161 F.3d at 360 (citing 28 U.S.C. § 2254(e)(1)).

Here, the trial court and the Michigan Court of Appeals both analyzed Petitioner's claim pursuant to the appropriate legal standard.  Petitioner is entitled to relief, therefore, only if he can demonstrate that the relevant state court decision[4] was based on "an unreasonable determination of the facts in light of the evidence presented."  While this is not an easy standard to satisfy, an examination of the record reveals that Petitioner is entitled to relief.

Petitioner has challenged the prosecutor's use of peremptory challenges to eliminate four jurors during the voir dire process: (1) Lorettia Bugs, (2) Prince Ella Bartee, (3) Diane Herrera, and (4) Verna Williams.  Before analyzing the unreasonableness of the trial court's factual

---

[4]  The relevant state court decision in this instance is that made by the trial court denying Petitioner's challenge to the prosecutor's improper use of his peremptory challenges.  It was the trial court that made the factual findings on which subsequent state courts relied in denying Petitioner's appeal of this claim.  Neither the Michigan Court of Appeals nor the Michigan Supreme Court made any factual findings in this matter.  Because Petitioner can prevail in this matter only by showing that the denial of his challenge was premised upon an unreasonable interpretation of the facts, he must, therefore, challenge the trial court's factual determinations.  *See Rice*, 546 U.S. 342 (noting that at step three of the *Batson* analysis, the question "is whether the trial court's factual determination. . .was unreasonable"); *Snyder v. Louisiana*, 128 S.Ct. 1203 (2008) (Court evaluated defendant's *Batson* challenge by examining the trial court's factual findings).

determination, a brief discussion of the interaction each of these potential jurors had with the prosecutor and defense counsel is appropriate.  As part of this discussion, the Court will also describe the interaction which the prosecutor and defense counsel had with another individual, Mary Brandel, a white woman who the prosecutor allowed to serve on the jury which convicted Petitioner.

A.    Lorettia Buggs

Buggs was a member of the initial group selected to form the prospective jury panel. (Trial Transcript, March 18, 2003, 19).  After a series of preliminary questions by the trial judge, to which Buggs provided no answer which required further examination, the prosecutor began to question Buggs.  (Tr. 19-50).  The prosecutor first questioned Buggs to determine if she understood the concept of circumstantial evidence and whether she would be able to follow instructions that permitted her to rely on circumstantial evidence. (Tr. 51-52).  Buggs responded affirmatively to both inquiries, at which point the prosecutor began questioning another juror.  (Tr. 52-54).  A few moments later, after asking the entire panel whether any of them would experience a problem evaluating whether a person is telling the truth, the prosecutor stated to Buggs, "you're looking at me kind of funny."  (Tr. 55-56).  Buggs responded, "I don't know.  I'm just listening."  (Tr. 56). This was the extent of the interaction that Buggs had with the court and attorneys during the voir dire process.

B.    Prince Ella Bartee

Bartee was selected for the jury panel following the elimination for cause of two jurors.  (Tr. 92-97).  The trial judge first asked Bartee if her answers to his preliminary questions

41

would "have been any different from those answers given by the majority of the original panel." (Tr. 97-98). Bartee answered, "no," at which point the prosecutor was given the opportunity to question her. (Tr. 98). The prosecutor first ascertained that Bartee's answers to his previous questions were the same as the other panel members. (Tr. 98). The prosecutor then questioned Bartee about the evidence necessary to convict a defendant of possession, focusing on whether she could convict a defendant of possession even though the defendant did not physically possess the item in question. (Tr. 98-101). Bartee's responses reveal that she understood the concept of constructive possession and, furthermore, she stated that she would follow the court's instructions on the issue. (Tr. 98-101). The prosecutor then asked Bartee if she was capable of serving as "a fair and impartial juror," to which Bartee stated, "yes." This was the extent of the interaction that Bartee had with the court and attorneys during the voir dire process.

C.    Diane Herrera

Herrera was selected for the jury panel following the elimination of three additional jurors: (1) an elimination for hardship, (2) a peremptory challenge by the prosecutor, and (3) a peremptory challenge by the defense. (Tr. 106-16). The trial judge first asked Herrera if her answers to his preliminary questions would "have been any different from those answers given by the majority of the original panel." (Tr. 116). Herrera answered, "no," at which point the prosecutor was given the opportunity to question her. (Tr. 116).

The prosecutor asked Herrera if she had "any positive or negative contact" with the police or prosecutor's office, to which Herrera responded, "no." (Tr. 116-17). The prosecutor then asked Herrera if she was "any relation to Santiago Herrera," to which Herrera reponded, "no" and

42

that she was "only a Herrera by marriage." (Tr. 117). After Herrera indicated that her sister "got arrested six years ago. . .for drugs," the prosecutor asked Herrera whether that experienced biased her toward police officers. (Tr. 117-18). Herrera responded, "no" and also stated that she was capable of serving as a "fair and impartial" juror. (Tr. 118). In response to further questioning by the prosecutor, Herrera indicated that she understood the concept of constructive possession and would follow the court's instructions on the matter. (Tr. 118).

A few moments later, the prosecutor asked Herrera if she was related to Carlos Herrera. (Tr. 129-30). Herrera indicated that Carlos Herrera was her husband's cousin. (Tr. 130). The prosecutor then asked Herrera if she aware whether Carlos Herrera "has had any contact with the police recently." (Tr. 130). Herrera responded that she had "heard" of such, but that she "don't know really nothing about it because [Carlos] really don't - he don't really come over to talk." (Tr. 130-31). The prosecutor then asked Herrera, "so you don't hang out on a regular basis?," to which Herrera stated, "no, not at all." (Tr. 131). Herrera then reiterated that she was not biased against the police and could be fair and impartial. (Tr. 131). This was the extent of the interaction that Herrera had with the court and attorneys during the voir dire process.

D.     Mary Brandel

Brandel was selected for the jury panel following the elimination of five additional jurors: (1) one for cause, (2) one peremptory challenge by the defense, and (3) three peremptory challenges by the prosecutor.[5] (Tr. 116-34). Upon her selection for the jury panel, the following

---

[5]   Of the three peremptory challenges the prosecutor exercised between the time Diane Herrera and Mary Brandel were selected for the jury panel, one was exercised to excuse Lorettia Buggs and another was exercised to excuse Prince Ella Bartee.

exchange occurred between Brandel, the trial judge, the prosecutor, and defense counsel:

| | |
|---|---|
| THE COURT: | Ma'am, did you have an opportunity to hear the questions I asked the original panel? |
| BRANDEL: | I did. |
| THE COURT: | And ma'am, would your answers have been any different from those answers given by the majority of the original panel? |
| BRANDEL: | No. |
| THE COURT: | Thank you.  Juror is with the People. |
| MR. HILSON: | Thank you, Judge.  Ms. Brandal, have you in any time in your life had any negative experiences with police officers? |
| BRANDEL: | No. |
| MR. HILSON: | Okay.  So you too would be able to listen to police officer testimony and weigh it just like every other witness in this particular case? |
| BRANDEL: | Uh-huh. |
| MR. HILSON: | How about anybody in your family, whether it be relatives or, you know - - |
| BRANDEL: | Nothing that's directly affecting me. |
| MR. HILSON: | Okay.  So, are you saying that some people in your family has had contact with the police? |
| BRANDEL: | Yeah. |
| MR. HILSON: | Okay.  Would that - - that idea that they have affect your ability to kind of listen to the police officer testimony? |
| BRANDEL: | No. |
| MR. HILSON: | Okay.  You can sit and be fair and impartial? |

BRANDEL:          Uh-huh.

MR. HILSON:        Anything that I talked about while I was doing the - - my voir dire that I was asking a bunch of questions, do you have any questions (sic) to those questions that would be different than what the other jurors were responding?

BRANDEL:          No, no.

MR. HILSON:        Anything on your mind that you want to get out and say now that you have the opportunity to do it?

BRANDEL:          No.

MR. HILSON:        All right.  I have nothing further, Judge.  Thank you.

THE COURT:        Mr. Krueger?

MR. KRUEGER:     Thank you, Judge.  Do you feel comfortable sitting on this jury panel?  I get the impression that you don't want to be here.

BRANDEL:          Really?

MR. KRUEGER:     Okay.  Can you give the Court and the witnesses your undivided attention?

BRANDEL:          Yeah.

MR. KRUEGER:     Do you have a family member that has a drug problem?

BRANDEL:          Yes.

MR. KRUEGER:     Is this person real close to you, daily contact?

BRANDEL:          Yeah.

MR. KRUEGER:     Serious drug problem?

BRANDEL:          Yeah.

MR. KRUEGER:     That's going to affect your thinking in this case, isn't it?

| | |
|---|---|
| BRANDEL: | Possibly. |
| MR. KRUEGER: | Do you really think you can be fair and impartial to this Defendant if you remain on this panel as a juror? |
| BRANDEL: | Yeah. |
| MR. KRUEGER: | I have no further questions. |

(Tr. 134-37).

This was the extent of the interaction that Brandel had with the court and attorneys during the voir dire process.

E.     Verna Williams

Williams was selected for the jury panel following the elimination of two additional jurors: (1) one for cause, and (2) a peremptory challenge by the prosecutor to eliminate Diane Herrera.  (Tr. 134-40).  Upon her selection for the jury panel, the following exchange occurred between Williams, the trial judge, the prosecutor, and defense counsel:

| | |
|---|---|
| THE COURT: | Ma'am, did you have an opportunity to hear the questions I asked the original panel? |
| WILLIAMS: | Yes, I did. |
| THE COURT: | And, ma'am, would your answers have been any different from those answers given by the majority of the original panel? |
| WILLIAMS: | They may vary. |
| THE COURT: | How would they differ, ma'am? |
| WILLIAMS: | Well, due to the fact that I do have two brothers that were involved in drugs. |
| THE COURT: | You feel that gives you a bias? |

46

WILLIAMS:           I would like to say I wouldn't let it, but I can't say for sure.

THE COURT:         Do you think you may have a bias then, is that correct, or not?

WILLIAMS:           It may be.  I don't - - I ain't exactly sure.

THE COURT:         All right.  Any other areas where your answers would have been different?

WILLIAMS:           Situations dealing with police.

THE COURT:         All right.  You have had - - Do you have strong attitudes towards police?

WILLIAMS:           Yes

THE COURT:         All right.  Are those positive or negative?

WILLIAMS:           Some of both.

THE COURT:         Do you feel that's going to influence how you view police testimony?

WILLIAMS:           Not necessarily.

THE COURT:         All right.  Well, do you feel you can be totally neutral and impartial for both sides, or do you feel - -

WILLIAMS:           Yes.

THE COURT:         - - you would have answered those questions differently in ways that might give you a bias for or against one side or the other?

WILLIAMS:           I don't think I would be biased.

THE COURT:         All right.  Thank you.  Thank you.  Juror is with the People.

MR. HILSON:        Thank you, Judge.  Ms. Williams, let's just explore that for a second.  You said that you have had some contact with the police that I guess left you with a negative feeling towards police officers.
Is that - -

47

WILLIAMS:            No, not any one in particular, just dealing with situations amongst my neighborhood.

MR. HILSON :        Okay.  Dealing with situations that you have complained about and they haven't done an adequate job in your mind or is that - -

WILLIAMS:            Right.

MR. HILSON:         Is that - -

WILLIAMS:            Right.

MR. HILSON:         That experience, is that going to cause you to think about having sort of a bias or you're going to mark a strike already for the police officers - -

WILLIAMS:            No.

MR. HILSON:         - - before they testify?

WILLIAMS:            No, not necessarily due to the fact police are people also.  So we all have our faults.

MR. HILSON:         Okay.  Are you going to hold that against the officers that are going to testify in this case?

WILLIAMS:            No.

MR. HILSON:         Any of the officers that I listed, were they involved in any of the complaints that you had?

WILLIAMS:            None of the names ring a bell, so I don't know them.

MR. HILSON:         All right.  Let's talk about, you've indicated you have two brothers that are involved in drugs or had drug problems?

WILLIAMS:            Yes.

MR. HILSON:         Did I hear you correctly?

WILLIAMS:            Yes.

48

MR. HILSON:      Okay.  Are - - Do they have any cases pending?

WILLIAMS:        Not at this time.

MR. HILSON:      The fact that your brothers are involved in drugs or have had some contacts with I'm assuming the police because of their drug use or involvement, is that going to cause you to be unfair or biased in this particular case?

WILLIAMS:        No, no.

MR. HILSON:      Because this is a drug case.

WILLIAMS:        I understand that.

MR. HILSON:      Okay.  Can you sit and listen to the testimony even though it involves drugs and listen and weigh and make up in your mind what the facts are?

WILLIAMS:        Of course.

MR. HILSON:      Okay.  This - - Do your brothers, let me ask you this, do your brothers live with you?

WILLIAMS:        No.

MR. HILSON:      No.  Do you see them on a regular basis?

WILLIAMS:        Maybe once or twice a week.

MR. HILSON:      Okay.  Do you talk to them about their situations with - - with drug use or however involved - - however they are involved in drugs?

WILLIAMS:        Well, I have tried to, but I kind of don't want to all the time first.  A lot of times they think I'm putting them down and I'm not.  I'm just trying to show them that, you know, I understand what they going through, and I don't like it and I would like to see them in a better life.

MR. HILSON:      Okay.  And Ms. Williams, I don't mean to embarrass you with this question, but have you ever been involved or had run-ins with the police in drugs at all?

WILLIAMS:        No.

MR. HILSON:      Okay.  This - - We've talked quite a bit about this idea of possession with the Hope Diamond.  The fact that if the Court instructs you that possession can be, you know, the diamond in my pocket, or the diamond in a bus locker, or someplace else, if you're instructed on that, can you follow that instruction?

WILLIAMS:        Of course.

MR. HILSON:      All right.  Anything else on your mind that you wanted to answer?  Maybe I didn't ask the question, or you sat back in the stands here, so to speak, and you wanted to say something and didn't have an opportunity to say?

WILLIAMS:        Oh, no.

MR. HILSON:      Okay.  Thank you.

MR. KRUEGER:     Ms. Williams, I believe you indicated that you had some contact with the police which you considered to be we'll say not exactly favorable?

WILLIAMS:        Yes.

MR. KRUEGER:     Would one of those situations be where you called the police to complain about maybe drug use in your neighborhood and they didn't - -

WILLIAMS:        No, it wasn't drug use.  I called the police to complain about the kids coming home from school and they were fighting.

MR. KRUEGER:     Okay.  And nobody showed up in time to deal with it I take it.

WILLIAMS:        No.  They never do.

MR. KRUEGER:     Do you understand that in this case what we are really trying to establish is that you can be totally fair to the prosecution and totally fair to the defense?

WILLIAMS:        Of course.

| | |
|---|---|
| MR. KRUEGER: | And you can do that? |
| WILLIAMS: | Yes. |
| MR. KRUEGER: | You can put aside any problems your brothers may have, particularly in view of the fact they may be addicted to drugs, and deal with this case strictly on the sworn testimony and exhibits in the case? |
| WILLIAMS: | One has nothing to do with the other. |
| MR. KRUEGER: | So I take it the answer would be yes - - |
| WILLIAMS: | Yes. |
| MR. KRUEGER: | - - you could take it out of the equation, so to speak? |
| WILLIAMS: | Yes. |
| MR. KRUEGER: | Okay.  Thank you. |

(Tr. 140-48).

This was the extent of the interaction that Williams had with the court and attorneys during the voir dire process.

At the conclusion of voir dire, Petitioner objected to the prosecutor's use of his peremptory challenges to eliminate every potential African-American juror from the panel, as well as Diane Herrera, an Hispanic juror.  The following exchange then occurred:

| | |
|---|---|
| THE COURT: | All right.  Mr. Krueger, I understand you have an objection? |
| MR. KRUEGER: | Yes |
| THE COURT: | I would like - - I would like if you would, please, if you could give the names of the three jurors you're concerned with for the record.  And go right ahead now. |
| MR. KRUEGER: | Yes, Your Honor.  I would indicate to the Court that this is a new experience for me so that I'm sort of feeling my way on this point.  But there were, on the jury panel, there were, and |

51

I'm disregarding two African Americans that were excused for cause, but there were three African American jurors that were called on the panel. There was a Prince Ella Bartee, a Lorettia Buggs, and a Verna White Williams, who were African American. And the prosecutor excused all three of them peremptorily.

In addition, there was a Hispanic American juror, I think it was Mrs. Herrera. I am going to look for her first name again. I believe it was Diane Herrera, and the prosecutor also excused her peremptorily.

I would note for the record that I believe that the jury panel is now entirely Caucasian. I do not think there is any minorities of any nationalities on the current jury panel. I could not ascertain as to any reason that the prosecutor would excuse these jurors. They did not - - There were other jurors on the panel who had contacts of different types that would perhaps give some rise or reason for challenging the juror peremptorily, but I did not, from the questions that were asked by the Court, by the prosecutor, and myself, see any reason that would indicate that these jurors would not be entirely fair and impartial jurors without any particular basis that would cause the prosecutor to exclude them, other than the fact that they are African Americans or a minority.

THE COURT:        Well, the rule I believe the Court has to apply in analyzing that motion is summarized in Michigan Criminal Law and Procedure Practice Desk Book by Gillespie, the 2002 Edition, at Section 15.37. And the rule summarized reads as follows:

The prosecutor's use of peremptory challenges to exclude jury members of the defendant's race solely on racial grounds violates the equal protection rights of both the defendant and the excluded jurors. A prima facie case established by showing that the defendant is a member of a cognizable racial group, that the groups members have been excluded from his jury, and that the circumstances raise an inference that the exclusion was based on race. The prosecutor must then explain the peremptory challenges with a neutral reason.

I believe defense has acknowledged that five of the jury array were African American. I'd note in passing the Defendant is

an African American.  Two of those jurors were excused for cause. Three were peremptorily challenged.

So at this time the Court would look to the prosecutor with each individual juror as to his statements as to whether or not he has a racially-neutral reason for excusing Priscilla (sic) Bartee, Lorettia Briggs (sic), and Verna White Williams.  So Mr. Hilson, go right ahead.

MR. HILSON:            Thank you, Judge.  First of all, Your Honor, I indicated I reserved my comments when we were at the side bar.  I guess I'm extremely disappointed that Mr. Krueger would bring this motion.  He and I have practiced law together, although not as long as he has, but at least for three years.  It's disturbing to me that he would think that I would dismiss somebody because they are of a certain race.  That to me is very upsetting.

I can tell the Court with great confidence that Ms. Bartee, the Bartee name is well known in Muskegon, having many contacts with the police.  Certainly that was one of the factors that I had in my mind that I excused her.  You know, it's - - I know that jurors - - we believe that jurors can be honest when they give their answers, but as this Court well knows, it's been doing it for a long time, sometimes there exists hidden agendas.  And I, being a trial lawyer, have to take that into account.  And one of the reasons why that I excused Ms. Bartee is because of that fact.  She has a very well-known name here in Muskegon County, a lot of Bartees have been charged, a lot of Bartees have been convicted in this county.

Secondly, Ms. Williams also talked about her brother being involved in drugs, and again, I - - I would like to believe that jurors are being honest with their answers when they give them, but again, I have to be concerned about hidden agendas.

I don't know whether or not Ms. Williams has a bias towards the prosecution or the police.  But certainly that is a factor that I have to consider, and it's a factor I did consider, that she has had contact, intimate contact with individuals who have been involved in drugs, very close, people that she sees on a regular basis.  And that was another factor I took into consideration when I excused Ms. Williams.  It had absolutely

53

nothing to do with her race.  Absolutely nothing to do with her race, as well as Ms. Bartee.

As far as Ms. Buggs is concerned, again it was a gut feeling on my part.  I watched her throughout the entire voir dire process.  Although she - - it looked like she was listening, Ii could - - I could tell that something didn't feel right with her.  And it had nothing to do with her race, but it looked to me as though she was a juror that would - - And I guess it's hard for me to explain, Judge, but it's one of those gut feelings you get when you look at a juror and you're not sure that they're going to sit and listen to all of the evidence and listen to what the attorneys say.  And that's the gut feeling I had, and that's why I excused her.  And again, it has absolutely nothing to do with the fact that she was an African American woman.

We have several females on the panel.  This is not a panel made up of Caucasian males.  My understanding is that we may even have one minority on the panel.  I'm not sure that it's all white.

So certainly, Judge, again, I - - I am extremely disappointed that this would be raised.  That Mr. Krueger would think that I - - I need to win this case at all costs and excluding members of the Defendant's race from the panel, and that is absolutely not what happened.

THE COURT:     Because the Defendant is African American, he has the right to challenge the exclusion of African American jurors.  I'm not sure if he has standing to challenge the exclusion by peremptory challenge of Hispanic jurors, but if you want to for the record, respond to that, you may.

MR. HILSON:    Sure.  I would love to, Judge.  Again, the Herrera name is well known here in Muskegon County.  Santiago Herrera and Carlos Herrera had - - have pending and had pending CSC charges.  Ms. Herrera indicated that she had heard about Carlos Herrera's brush with the law, and certainly in my mind again, I hate to belabor this, but I like to believe that jurors are being honest in their answers, but I have to be weary [sic] of the fact that there may be hidden agendas lying underneath that.  And that's what peremptory challenges are for.  It's those gut instincts you get.

54

And again, it has absolutely nothing to do with her being Hispanic.  Absolutely nothing with her being a woman.  It just - - it was one of those things where she has known contact with individuals that are being prosecuted or have been prosecuted.  And for those reasons, Judge, is why I excused her.

THE COURT:    Mr. Krueger, any response?

MR. KRUEGER:    Yes, I have a response, Your Honor.  To say that one is not being partial when they exclude a juror, an African American juror, because they have the same last name as someone or some people who have charges.

The prosecutor had every opportunity to ask Ms. Bartee is she had any close relatives or associates or friends and he did not elicit anything that I would indicate that there would be any remote reason to - - to exclude her as a juror, other than the fact she had the name Bartee.

I would point out to the Court that Mary Brandel, the Caucasian juror that was on the panel, when you are talking about picking up on a jury (sic) that has some problems, it was very obvious to me that that lady was really quite unhappy about being on the jury panel.  And I did bring out from her, which she did not bring out voluntarily, the fact that she has some serious drug problems in her family; and I deliberately left her on the panel to see what the prosecutor would do about a Caucasian juror that had this kind of a situation.  And the prosecutor was given an extra peremptory challenge and she still remains on the jury panel.

So I don't accept the argument that one of the jurors, an African American juror who has a family member or members who might have some drug problems who came out and was clear about their situation and did not - - and I won't say that the - - that Ms. or Mrs. Brandel actively avoided it, but she certainly didn't volunteer it.

And so I don't buy the argument that an African American juror who has a family member and they come right out and say: Yes, I have a family member who has a drug problem, but I can be fair and impartial, the prosecutor is arguing that,

well, I have to exclude her or I have the right to exclude her because she - - not because she's African American, but because there's a family member that has a drug problem. The problem I have with that is that we had a Caucasian juror who was not forthright about it and the prosecutor did not see a problem with discharging that juror, and he had several opportunities if he wished to do so, to exclude that juror. And if that's his reason, then I would expect that that juror would have been excused.

THE COURT:        Any response?

MR. HILSON:       Yes, Judge.  Just in response, as the Court recalls, I had one pre-empt left.  I had a choice between Ms. Brandel and I had a choice between the juror I did excuse, Ms. Kaffenberger, who based on her questionnaire was confined in a mental institution.  And the - - the Court heard her response to my question about being a juror and following the Constitution, and to me that sounded like somebody who wasn't all there.

So I had - - I had a choice.  I chose the juror that I thought may have had some mental issues.  And that was my last pre-empt, Judge.

And I guess, Judge, the other thing that that I would say is that in reference to what Mr. Krueger is saying as far as Ms. Brandel is concerned, we have, in fact, prosecuted Bartees and Herreras.   I'm unaware of any case involving the Brandels or the Brandel name, and I guess I would leave it - - I would respond to Mr. Krueger's counter-argument to that, that, you know, that it is out there.

THE COURT:        All right.  I do want to indicate in passing that as I read further in the bench book, that Defendant, as an African American, does have the right to raise the issue of the exclusion of the Hispanic juror as well, although we have already covered that on the record.  So, I guess we don't have to go any further on that point.

Mr. Krueger, any response?

MR. KRUEGER:     No.  I have nothing further.

56

THE COURT:                  All right.  Well, I will also follow the analysis at Section 1544
                            of the bench book which states:

                            First, the opponent of the challenge must make a prima facie
                            case of discrimination.

                            It's a very close question.  I'm not sure a prima facie case of
                            discrimination has been made out.  The prosecutor certainly
                            did not use all his challenges to excuse - - I should say, the
                            prosecutor did not us all five peremptory challenges - - or I
                            should say six because I did give an extra one to each side.
                            The prosecutor did not use five of his six peremptory
                            challenges to excuse all five African American jurors in the
                            array.  Two were excused by cause.

                            Even if the Court were to find that there was a prima facie
                            case of discrimination, the Court finds that the prosecutor has
                            offered race-neutral reasons, which the Court does accept as
                            race neutral, for the peremptory challenges being exercised in
                            the manner they were.

                            The Court does not find that the opponent of the challenges
                            has proven purposeful discrimination.  The Court notes that
                            the ultimate burden of persuasion rests with the opponent of
                            the challenge.

                            Also, the U.S. Supreme Court has held in Perkett versus Elim
                            (sp?) At 514 U.S. 765, that good cause is not required in order
                            to justify the challenge.  Rather, a neutral reason must be
                            offered.

                            And the Court finds there are sufficient neutral reasons on the
                            record as to the excusing of the three African American jurors
                            and the Hispanic juror.  Of the six peremptory challenges, I
                            believe the prosecutor used three against African Americans,
                            one against a Hispanic, and two on Caucasians I believe.

                            I would state in passing that Mr. Krueger's motion is not
                            frivolous.   I understand perhaps the prosecutor taking
                            umbrage at it.  None of us can read the human heart.  All I
                            know is on the - - on the surface of what happened, it
                            certainly was a legitimate motion for the defense to raise,
                            even though they haven't carried the day.  One can understand

                                                    57

where the defense's concern when he is representing an African American client, where there are five African American jurors in the array, two are excused by cause and the prosecutor excuses the three remaining ones, that that at least would give the defense a question in their mind as to motivation.  Nothing personal with the prosecutor, but just what happened.  It certainly gives a legitimate reason to raise the inquiry.

So even though I'm denying the defense motion, the Court finding that the prosecutor has provided racially-neutral reasons which are common in every trial regardless of the race or gender of a juror as to reasons to exercise peremptory challenges.  That Mr. Krueger's motion, again, was certainly not frivolous and - - but I don't think he has met his burden of proof to show that this was a racially-motivated challenge, and the Court does find racially-neutral reasons for the excusing of the three African American jurors and the one Hispanic juror by the use of a prosecutor's peremptory challenges.

(Tr. 169-82).

As the language quoted above reveals, it is not entirely clear whether the trial judge found that Petitioner had established a prima facie case that the prosecutor exercised his peremptory challenges in a discriminatory manner to eliminate the jurors in question.  To the extent that the judge's comments are interpreted so as to conclude that Petitioner failed to make the requisite showing, the Court finds that such is an unreasonable factual determination.

As previously noted, at the first step of the analysis the trial judge is required to consider "all relevant circumstances," which in this instance include: (1) the prosecutor's first attempt to secure a conviction of Petitioner, a man the prosecutor characterized as a "major drug dealer" and a "pretty dangerous guy," ended with a hung jury, which it is not unreasonable to conclude increased the pressure on the prosecutor to prevail at the second trial; (2) the prosecutor

exercised his peremptory challenges so as to eliminate every African-American juror, as well as another Hispanic juror; (3) the prosecutor questioned Diane Herrera and Verna Williams at length about their "involvement" with individuals with criminal backgrounds or police contact, but declined to subject Mary Brandel to similar questioning when she acknowledged that "some people" in her family "had contact with the police;" (4) the prosecutor excused Prince Ella Bartee allegedly because "the Bartee name is well known in Muskegon," but failed to even inquire whether Bartee knew or was related to any of the allegedly numerous Bartees charged with crimes in Muskegon County; (5) the prosecutor discharged Lorettia Buggs on a vague "gut feeling" after she provided no responses in voir dire that would support elimination from the jury; and (6) the prosecutor excused Diane Herrera and Prince Ella Bartee due to unsubstantiated concerns about their alleged relationship to or association with criminal offenders, but expressed no such qualms about Mary Brandel or Donna Long,[6] white jurors who acknowledged having family members with a history of drug use.

The Court also notes that the prosecutor went into Petitioner's second trial without the testimony of Tina Halasinski.  It is not clear from the record why Halasinski did not testify at Petitioner's second trial.  At Petitioner's post-conviction evidentiary hearing, however, Carl Krueger testified that from the outset of his representation of Petitioner, it was unclear whether Halasinski would actually testify against Petitioner.  (Hearing Transcript, March 16, 2004, 50). Attempting to prosecute Petitioner at the second trial without Halasinski's testimony would certainly have provided incentive for the prosecutor to attempt to secure as favorable a jury as possible.  The Court maintains that if the circumstances of this case do not establish a prima facie case that the prosecutor exercised

---

[6] Donna Long indicated that her son had in the past experienced a "serious" drug problem.  (Tr. 19, 84).  Long was unsure whether her son was presently using drugs.  (Tr. 85).

his peremptory challenges in a discriminatory manner, then no defendant will ever be able to advance a successful *Batson* claim.

At step two of the analysis, the trial judge determined that "the prosecutor has offered race-neutral reasons" for exercising his peremptory challenges to excuse the jurors in question. While the prosecutor's stated reasons do not survive scrutiny at step three of the analysis, the trial judge's conclusion that the prosecutor's alleged reasons were race-neutral is not unreasonable. Petitioner asserts that the trial judge's determination that he failed to sustain his burden at step three of the analysis is an unreasonable determination in light of the facts presented. An analysis of the manner in which the prosecutor exercised his peremptory challenges persuades the Court that Petitioner is entitled to relief. The Court reiterates that this analysis must take into account "all of the circumstances that bear upon the issue of racial animosity." *Snyder*, 128 S.Ct. at 1208. As discussed above, there exist numerous facts and circumstances which are relevant in this matter.

The prosecutor exercised his first peremptory challenge to excuse Vincent Levandowski, who acknowledged during voir dire that he had previously been convicted of a drug offense. (Tr. 19, 66-69, 112).

The prosecutor exercised his second peremptory challenge to excuse Lorettia Buggs. (Tr. 119-20). As noted above, Buggs did not say anything during voir dire that would seem to have legitimately disqualified her to serve as a juror. When challenged as to why he excused Buggs, the prosecutor stated that it was based on a "gut feeling" that "something didn't feel right with her." (Tr. 174). The Court recognizes that it is difficult to successfully challenge a peremptory challenge exercised because of a "juror's demeanor." *See Snyder*, 128 S.Ct. 1208. The Court must likewise be mindful, however, that to simply accept without question such general and vague rationale would

render the Equal Protection Clause "a vain and illusory requirement." *Batson*, 476 U.S. at 98.

The prosecutor exercised his third peremptory challenge to excuse Diane Leafers. (Trial Transcript, March 18, 2003, 19, 125). During voir dire, Leafers indicated that she was employed as a secretary for the Muskegon Police Department. (Tr. 27). Leafers asserted that she was nonetheless able to "be neutral and objective." (Tr. 27). Leafers was later questioned how she decides if somebody is worthy of belief. (Tr. 54). Leafers responded that she considers their body language, eye contact, motivation, and biases. (Tr. 54-55). Leafers also indicated that she would be able to follow the court's instructions concerning the matters she could consider when evaluating a witness' truthfulness. (Tr. 55).

The prosecutor exercised his fourth peremptory challenge to eliminate Prince Ella Bartee. (Tr. 128). As indicated above, none of Bartee's responses during voir dire establish a legitimate basis for disqualification. The prosecutor nevertheless eliminated Bartee despite her assurance that she was able to serve as a "fair and impartial juror." The prosecutor stated that he excused Bartee because "the Bartee name is well known in Muskegon, having many contacts with the police." (Tr. 172). The prosecutor also expressed concern about unspecified "hidden agendas" to which Bartee might subscribe. (Tr. 172-73). Despite the allegation that "a lot of Bartees have been charged, a lot of Bartees have been convicted in this county," (Tr. 173), the prosecutor never identified any crime of which any Bartee had allegedly been charged or convicted. The prosecutor never questioned Bartee to determine whether she was related to, knew, or associated with any of the other Bartees who allegedly have run afoul of the law in Muskegon County. The prosecutor's failure to question Bartee about these matters suggests that such were simply irrelevant to his decision to eliminate Bartee as a juror.

The Court notes that while the prosecutor dismissed Bartee due to unsubstantiated concerns about her *alleged* relationship to or association with criminal offenders to whom she was *presumably* related, the prosecutor exhibited no such qualms about white jurors who acknowledged having family members with a history of drug use.  Donna Long indicated that her son had in the past experienced a "serious" drug problem.  (Tr. 19, 84).  Long was unsure whether her son was presently using drugs.  (Tr. 85).  Long was nonetheless permitted to serve on the jury that convicted Petitioner. As previously noted, Mary Brandel acknowledged during voir dire that a "close" member of her family, with whom she has "daily contact," has a "serious" drug problem.  (Tr. 136-37).  Brandel further stated that this circumstance would "possibly" affect her "thinking" in this matter.  (Tr. 137). The prosecutor nonetheless allowed Brandel to serve as a juror.  Where a prosecutor excuses a minority juror based on a rationale that applies with equal (or greater) force to a white juror, such demonstrates the "implausibility" of the prosecutor's contention that he did not engage in purposeful discrimination in violation of *Batson*.  *See Snyder*, 128 S.Ct. at 1211.

The prosecutor used his fifth peremptory challenge to excuse Diane Herrera.  (Trial Transcript, March 18, 2003, 116, 137-38).  The prosecutor indicated that he excused Herrera because "the Herrera name is well known here in Muskegon County."  (Tr. 175).  Specifically, the prosecutor asserted that Santiago Herrera and Carlos Herrera "had - have pending and had pending CSC charges."  (Tr. 175).  Noting that Diane Herrera acknowledged that she had "heard about Carlos Herrera's brush with the law," the prosecutor again expressed his concern about "hidden agendas" to which Herrera might subscribe.  (Tr. 175-76).  The prosecutor further stated that "it was one of those things where [Herrera] has known contact with individuals that are being prosecuted or have been prosecuted."  (Tr. 176).

Diane Herrera stated that she was "only a Herrera by marriage." (Tr. 117). Diane Herrera indicated that she was not related to Santiago Herrera, (Tr. 117), and she made no comments indicating that she ever associated with or spoke with Santiago Herrera. With respect to Carlos Herrera, Diane Herrera indicated that Carlos was her husband's cousin, but that she did not associate or speak with him. (Tr. 130-31). Thus, the prosecutor's stated rationale that he excused Diane Herrera because she has contact with "individuals that are being prosecuted or have been prosecuted" enjoys no support in the record. The Court again notes that while the prosecutor dismissed Herrera due to unsubstantiated concerns about her alleged relationship to or association with individuals who have run afoul of the law, the prosecutor exhibited no such qualms with respect to jurors Long and Brandel, white jurors who acknowledged having family members with a history of drug use. The Court also notes that while Herrera assured the court that she could serve as a fair and impartial juror, Mary Brandel acknowledged that her circumstance could "possibly" impact her ability to serve as a fair and impartial juror. The prosecutor's decision to exercise a peremptory challenge to eliminate Diane Herrera rather than Mary Brandel[7] supports Petitioner's claim in this matter. *See Snyder*, 128 S.Ct. at 1211.

The prosecutor used his sixth (and to that point last) peremptory challenge to eliminate Verna Williams. (Tr. 140, 149). A review of the statements Williams made during voir dire indicate that it was perhaps not unreasonable for the prosecutor to seek her elimination from the jury panel. It must be remembered, however, that the question is not whether the prosecutor was justified in excusing Williams from the jury. Instead, the question is whether the prosecutor

---

[7]  Mary Brandel was selected for the jury panel (and questioned by the prosecutor and defense counsel) prior to the prosecutor's decision to use a peremptory challenge to strike Diane Herrera.

exercised his peremptory challenges in a racially discriminatory manner.  In this respect, the Court notes that the rationale the prosecutor articulated for eliminating Verna Williams applied with equal force to Mary Brandel.  That the prosecutor chose to eliminate Williams, the last remaining African-American on the juror panel, while allowing Brandel to remain further supports Petitioner's position.

The prosecutor and defense counsel were subsequently afforded an additional peremptory challenge each following the elimination of a member of the jury panel on hardship grounds.  (Tr. 155-58).  The prosecutor exercised his last peremptory challenge to eliminate Tamera Kaffenberger.  (Tr. 159-63).  The prosecutor later asserted that he excused Kaffenberger because she indicated on her juror questionnaire that she "was confined in a mental institution."  (Tr. 178).  The prosecutor further asserted that it sounded to him as if Kaffenberger "wasn't all there."  (Tr. 178).

While Petitioner seeks relief on the ground that the prosecutor unlawfully exercised his peremptory challenges to exclude four jurors for racially discriminatory reasons, Petitioner need satisfy his burden as to only one juror to be entitled to relief.  *See Snyder*, 128 S.Ct. at 1208.  The Court nonetheless finds that Petitioner has satisfied his burden as to all four jurors in question.

With respect to Diane Herrera and Prince Ella Bartee, the Court concludes that Petitioner has presented clear and convincing evidence that the trial judge's ruling concerning their removal from the jury panel was unreasonable.  In addition to the numerous facts and circumstances detailed above which support Petitioner's claim, the prosecutor eliminated these two jurors on the basis of a rationale that was equally applicable (if not more so) to white jurors which the prosecutor declined to challenge.  As the Supreme Court recently recognized, such a circumstance demonstrates the "implausibility" of the prosecutor's proferred explanation that he did not exercise his peremptory challenges in a racially discriminatory manner.  *Id.* at 1211.

64

While it is perhaps a closer call, the Court finds that Petitioner has likewise satisfied his burden as regards Lorettia Buggs and Verna Williams.  In this respect, the Court again notes that the evaluation of the circumstances under which these two jurors were eliminated must take into account "all of the circumstances that bear upon the issue of racial animosity," including the elimination of jurors Herrera and Bartee for racially discriminatory reasons.  *See Snyder*, 128 S.Ct. at 1208 (recognizing that it is appropriate to consider the circumstances under which one particular juror is discharged when determining whether a defendant has satisfied his burden regarding the elimination of another juror).  In light of all the relevant facts and circumstances, the Court concludes that Petitioner has satisfied his burden of demonstrating that the trial judge's decision as to jurors Buggs and Williams constituted an unreasonable factual determination.

## CONCLUSION

For the reasons articulated herein, the Court finds that Petitioner is being confined in violation of the United States Constitution.  Accordingly, the undersigned recommends that Elder's petition for writ of habeas corpus be **granted**.  The undersigned further recommends that the State of Michigan either release Petitioner from custody or afford him a new trial within 120 days.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  February 5, 2009                          /s/ Ellen S. Carmody
                                                 ELLEN S. CARMODY
                                                 United States Magistrate Judge